# United States Court of Appeals
## For the First Circuit

No. 08-1800

UNITED STATES OF AMERICA,

Appellee,

v.

JOSÉ CINTRÓN-ECHAUTEGUI,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Aida M. Delgado-Colón, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Selya, Circuit Judges.

Lorenzo J. Palomares, with whom Lorenzo Palomares, P.S.C. was on brief, for appellant.
Julia M. Meconiates, Assistant United States Attorney, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, and Nelson Pérez-Sosa, Assistant United States Attorney (Appellate Chief), were on brief, for appellee.

April 14, 2010

**SELYA**, **Circuit Judge**. Defendant-appellant José Cintrón-Echautegui, who pleaded guilty to a charge of conspiracy to distribute controlled substances, alleges that the district court erred in calculating drug quantity and, therefore, imposed an overly harsh sentence. Discerning no error, we affirm the judgment below.

Because this appeal follows a guilty plea, we draw the facts from the change-of-plea colloquy, the presentence investigation report (PSI Report), and the transcript of the disposition hearing. See United States v. Santos, 357 F.3d 136, 138 (1st Cir. 2004); United States v. Dietz, 950 F.2d 50, 51 (1st Cir. 1991).

A federal grand jury sitting in the District of Puerto Rico indicted a number of suspected participants in a notorious drug ring known as "Las Avispas." These individuals, including the appellant, were charged with conspiring to distribute controlled substances. See 21 U.S.C. §§ 841(a)(1), 846.

The appellant initially maintained his innocence. Along with several codefendants, he went to trial on February 11, 2008. After five days, however, he opted out of the trial and entered a straight guilty plea, unaccompanied by any plea agreement. Meanwhile, the trial continued as to six of his codefendants, all of whom were eventually found guilty.

During his change-of-plea hearing, the prosecutor maintained that the appellant had sold drugs for Las Avispas during a four-year span from 2003 to 2007. The appellant accepted this account. In addition, he admitted to possessing 255 capsules of crack cocaine, which contained, in the aggregate, 17.53 grams of cocaine base.

In accordance with the customary routine, the district court directed the probation department to prepare the PSI Report. That report, when completed, was delivered to the prosecutor, the appellant (through his counsel), and the court. We summarize certain pertinent entries.

According to the PSI Report, Las Avispas purveyed an assortment of drugs, including crack cocaine (cocaine base), heroin, and marijuana. The report referenced trial testimony from a cooperating witness, José Rivera-Díaz, who confirmed that Las Avispas ran two drug points, each of which operated twenty-four hours a day, seven days a week, fifty-two weeks a year (with the exception of Holy Friday).

Each drug point was manned by three shifts of sellers daily — a morning shift, an afternoon shift, and a night shift. On average, each shift participant would sell approximately 200 capsules of crack cocaine, together with other kinds of drugs, during each morning and afternoon shift. The night shifts were

busier; each night-shift vendor would sell, on average, between 700 and 900 capsules of crack, along with other drugs.

The PSI Report summarized the trial testimony of a forensic scientist. This portion of the report related that a typical crack cocaine capsule sold by Las Avispas contained, on average, .075 grams of cocaine base. Conservatively assuming average sales of 1,000 capsules per day, the drug ring had annual sales of 27.3 kilograms of cocaine base. Thus, during its four years of operations, the drug ring sold an estimated total of 109.2 kilograms of cocaine base.

The PSI Report further noted that, at trial, the scientist had been cross-examined about the methodology used to determine the per-capsule amount of cocaine base. The scientist responded that sampling was the method he had used, and that the samples used were capsules actually seized from the Las Avispas drug points. In the scientist's opinion, this sampling permitted a reasoned determination of an average drug weight per capsule.

The PSI Report indicated, too, that a confidential informant (CI) had identified the appellant as a seller of drugs for Las Avispas. The CI stated that the appellant was "usually" at one of the drug points, "dealing drugs" with two other members of the ring (whom he named). Both of these men had been indicted alongside the appellant.

The PSI Report contained more information from the CI about the appellant. For example, the CI identified the appellant as having stored both guns and drugs for Las Avispas. Moreover, the CI said that, on one occasion, the appellant had warned him (the CI) that the police were en route to one of the drug points.

The PSI Report went into some detail anent possible sentencing options. Among other things, the probation department recommended a series of sentencing calculations premised on the November 2007 edition of the guidelines (which controls here). It suggested a base offense level of 38, premised on a drug quantity of more than 4.5 kilograms of cocaine base. See USSG §2D1.1(a)(5), (c)(1). It arrived at a total offense level of 40 after applying various enhancing and mitigating adjustments, none of which is controverted here. Placing the appellant in criminal history category I, the probation department envisioned a guideline sentencing range (GSR) of 292-365 months. See id. Ch. 5, Pt. A (sentencing table).

The appellant interposed a timely objection to the proposed drug quantity determination and, by fair implication, to the calculations employed therein. He argued that the PSI Report rested this determination on unreliable computations and, thus, exaggerated his role in the conspiracy.[1]

---

[1] The appellant initially objected to an upward adjustment for use of a weapon in connection with a drug-trafficking offense, USSG §2D1.1(b)(1), but he waived this objection at the disposition

The district court convened the disposition hearing on May 20, 2008. The appellant renewed his objection to the proposed drug quantity. The government endorsed it. The court concluded that the estimates for both the number of capsules sold and the per-capsule drug weight were accurate. Nevertheless, the court decided to use a set of related assumptions even "more favorable to the [appellant]": it assumed that the appellant worked only daytime shifts; that he worked only three shifts a week; and that he sold an average of 200 capsules per shift.

Based on these assumptions, the court attributed 2.3 kilograms of cocaine base per year to the appellant. Taking into account the four-year life of the conspiracy, the court attributed a total drug quantity of 9.2 kilograms of crack to the appellant.[2] All of these findings were grounded in the recitals contained in the PSI Report.

With the drug quantity contretemps resolved, the court proceeded to sentence the appellant to a 292-month incarcerative term (the low end of the GSR). This timely appeal followed.

_____

hearing.

[2] The transcript of the disposition hearing lists this quantity as 94.2 kilograms. This is obviously a scrivener's error; the calculations elucidated by the court lead inexorably to a quantity of 9.2 kilograms. Thus, we accept the latter figure. Cf. United States v. Zapata, 1 F.3d 46, 47 n.2 (1st Cir. 1993) (explaining that when a sentencing court refers to the wrong edition of the guidelines but its "calculations faithfully track the [correct] version," we will disregard the obvious slip of the tongue).

The appellant advances two principal claims of error.[3] First, he argues that the sentencing court failed to make an individualized finding of drug quantity. Second, he argues that, in all events, the drug quantity determination was not supported by competent evidence. We deal with these claims sequentially.

We begin with the nature of the sentencing court's drug quantity determination. The appellant argues that the court made a conspiracy-wide determination rather than an individualized determination. Because the question of whether the district court's drug quantity determination was based on an individualized determination or not presents a question of law, our review is de novo. See United States v. Colón-Solis, 354 F.3d 101, 102 (1st Cir. 2004). If, however, the district court has engaged in an individualized determination, our review is for clear error.

Sentences in drug cases are largely driven by the amount and type of drugs involved. United States v. Sepulveda, 15 F.3d 1161, 1196-97 (1st Cir. 1993). When sentencing a participant in a

---

[3] The appellant also argues that the district court erred in using a special verdict form that was completed and returned by the jury. He says, correctly, that by the time the verdict was returned, he had pleaded guilty and, therefore, was not bound by the verdict. But this argument is belied by the record. While the court alluded to the special verdict form in passing, the appellant is not mentioned on it. Moreover, the record does not indicate that the court used either the form or the information contained therein in constructing the appellant's sentence. Finally, the conspiracy-wide drug quantity shown on the special verdict form — "[f]ifty (50) grams or more" — bears no real relationship to the court's drug quantity determination vis-à-vis the appellant.

drug-trafficking conspiracy, the district court must make an individualized finding concerning the quantity of drugs attributable to, or reasonably foreseeable by, the offender.[4] Colón-Solis, 354 F.3d at 103. In this case the sentencing court — contrary to the appellant's allegation — recognized that rule and complied with it. Although the court mentioned the conspiracy-wide drug quantity — that figure was certainly relevant as a check on the integers used in determining the amount of drugs attributable to the appellant — it clearly made an individualized determination. Specifically, the court attributed 9.2 kilograms of cocaine base to the appellant personally. This individualized determination, in turn, guided the court in fixing the appellant's base offense level (38). See USSG §2D1.1(a)(5), (c)(1). Given the state of the record, the appellant's first claim of error fizzles.

This brings us to the appellant's claim that the sentencing court's drug quantity determination was insupportable. The appellant advances three rationales in service of this claim.

First, the appellant suggests that the court erred by sentencing him on the basis of a drug quantity beyond that which he acknowledged at the change-of-plea hearing. This suggestion does not accurately reflect the law.

---

[4] There is an exception to this paradigm for cases in which the defendant's sentence is controlled by a mandatory minimum term of imprisonment required by an applicable statute. See, e.g., United States v. Goodine, 326 F.3d 26, 32-33 (1st Cir. 2003). This is not such a case.

Under the guidelines, a defendant may be held responsible at sentencing for relevant conduct, including "all acts and omissions committed . . . by the defendant." USSG §1B1.3(a)(1)(A); see United States v. Ortiz-Torres, 449 F.3d 61, 78-79 (1st Cir. 2006). Relevant conduct for which the defendant may be sentenced also includes, "in the case of a jointly undertaken criminal activity . . . all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." USSG §1B1.3(a)(1)(B). Thus, relevant conduct beyond what a defendant may admit during a plea colloquy may factor into the sentencing calculus. See Ortiz-Torres, 449 F.3d at 78-80 (upholding use of drug quantity greater than that admitted during change-of-plea hearing).

This principle controls here. The appellant's admission during the change-of-plea colloquy to possessing 17.53 grams of cocaine base served primarily as an explicit factual basis for his guilty plea. See Fed. R. Crim. P. 11(b)(3). It did not serve as a ceiling on the amount of drugs that could properly be attributed to him for sentencing purposes. "As an admitted participant in a drug trafficking conspiracy, [the appellant] is responsible . . . for drugs he himself sold, transported, or negotiated, as well as for drug quantities attributable to others that are reasonably foreseeable to him . . . ." Ortiz-Torres, 449 F.3d at 78-79. This

is true even if the relevant conduct is uncharged, see USSG §1B1.3(a); Santos, 357 F.3d at 140, or unconfessed.

Second, the appellant contests the quality of the evidence in the sentencing record. In particular, he asserts that his inability to cross-examine the witnesses whose testimony was recounted in the PSI Report requires vacation of his sentence. This assertion does not hold water.

The evidentiary requirements that obtain at sentencing are considerably less rigorous than those that obtain in criminal trials. See United States v. Tardiff, 969 F.2d 1283, 1287 (1st Cir. 1992); United States v. Zuleta-Alvarez, 922 F.2d 33, 36 (1st Cir. 1990). At sentencing, the court "may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." United States v. Zapata, 589 F.3d 475, 485 (1st Cir. 2009) (quoting USSG §6A1.3(a)).

In addition, a sentencing court has wide discretion to decide whether particular evidence is sufficiently reliable to be used at sentencing. United States v. Green, 426 F.3d 64, 66 (1st Cir. 2005); Tardiff, 969 F.2d at 1287. Under this generous formulation, the court may rely upon "virtually any dependable information." United States v. Sklar, 920 F.2d 107, 110 (1st Cir. 1990). This includes information that has never been subjected to

-10-

cross-examination. See United States v. Brewster, 127 F.3d 22, 28 (1st Cir. 1997); Tardiff, 969 F.2d at 1287. Similarly, a sentencing court generally may rely upon information contained in a presentence report. See, e.g., United States v. Cruz, 120 F.3d 1, 2 (1st Cir. 1997) (en banc); United States v. Morillo, 8 F.3d 864, 872 (1st Cir. 1993). These tenets are fully applicable to drug quantity determinations. See, e.g., Zapata, 589 F.3d at 485; United States v. Scalia, 993 F.2d 984, 989 (1st Cir. 1993).

That ends this aspect of our inquiry. We previously have held that "for sentencing purposes the court may rely upon evidence adduced at a coconspirator's trial as long as the defendant receives notice prior to its use and has the opportunity to challenge its reliability." Cruz, 120 F.3d at 2. Here, the challenged evidence came from witnesses who testified at the trial, and the PSI Report gave ample notice to the appellant of both the existence and the potential utility of this evidence. Under these circumstances, the district court did not err in using this evidence at sentencing. See Brewster, 127 F.3d at 28 (stating that facts contained in a presentence report "usually are deemed reliable enough to be used for sentencing purposes"); Zuleta-Alvarez, 922 F.2d at 37 (explaining that statements made under oath have "strong indicia of reliability").

Third, and lastly, the appellant contends that the sentencing court's drug quantity determination was faulty. We reject this contention.

The sentencing court must determine drug quantity only by a preponderance of the evidence. See United States v. Rodríguez, 525 F.3d 85, 107 (1st Cir. 2008). A sentencing court's determination of drug quantity is a finding of fact and, as such, will be upheld on appeal unless it is clearly erroneous. Id. Clear error will be found only when, upon whole-record-review, an inquiring court "form[s] a strong, unyielding belief that a mistake has been made." Cumpiano v. Banco Santander P.R., 902 F.2d 148, 152 (1st Cir. 1990).

The court below did not clearly err in making its drug quantity determination. A finding of drug quantity need not be exact so long as the approximation represents a reasoned estimate of actual quantity. See, e.g., Santos, 357 F.3d at 141; United States v. Ventura, 353 F.3d 84, 88 (1st Cir. 2003). In making such a reasoned estimate, the court is entitled to draw reasonable inferences from information contained in the sentencing record. See Santos, 357 F.3d at 141.

In this instance, the court derived its drug quantity determination by making plausible extrapolations from the available information. The court used the average drug weight per capsule suggested by the scientific evidence and the average drug sales per

shift suggested by the cooperating witness to arrive at a sensible starting point. This starting point was, in itself, favorable to the appellant because it left out of the equation drugs other than crack cocaine (e.g., heroin, marijuana) routinely marketed by Las Avispas at the two drug points.

The court then took into account the appellant's four-year tenure with the drug ring and attributed a quantity of drugs to him based on two assumptions: that the appellant worked only three shifts per week and that all of these were daytime shifts. These assumptions, too, were favorable to the appellant. The CI stated that the appellant was "usually" at one of the drug points, toiling as a seller. Three shifts per week seems to understate the regularity of his presence. Similarly, by assuming that the appellant worked only daytime shifts, the court eschewed any use of the greater sales volumes associated with the night shifts.

Using this methodology, the court attributed 9.2 kilograms of cocaine base to the appellant.[5] The court stated that in making these findings it had taken a "conservative" view of the evidence. We agree. For aught that appears, the court took reasonable steps to estimate the drug quantity attributable to the appellant and, in doing so, made modest and defensible assumptions.

_____

[5] The court multiplied three shifts per week by 200 capsules per shift by .075 grams of cocaine base per capsule, resulting in 2.3 kilograms per year (rounded down). Multiplying by his four-year participation in the conspiracy, the court attributed a total of 9.2 kilograms of cocaine base to the appellant.

-13-

In fine, the court followed the admonition that, in such matters, it should "err on the side of caution."  <u>Sklar</u>, 920 F.2d at 113. We discern no clear error.

We need go no further.  For the reasons elucidated above, we uphold the appellant's sentence.

**<u>Affirmed</u>**.